Hamilton *vs.* Warfield.—1830.

He cited 3 *Saun.* 209. *b. no.* 6 *Harr. and Johns.* 388. Act of 1788, *ch.* 80, *sec.* 11.

---

HAMILTON *vs.* WARFIELD.—*June,* 1830.

H chartered his vessel to W for a voyage to be made at and from B, to any port or ports in the West Indies, &c. and back to B, where the vessel was to be discharged, the dangers of the seas excepted; there was the usual covenant of sea-worthiness on, and during the voyage in the charter party. W agreed to pay a certain sum for each and every month, and so in proportion for a less time, as the vessel should be continued on the voyage—in ten days

after her return to B, or upon hearing of her loss; and also agreed, at his cost, to victual and man the vessel, and pay all port charges during the voyage. HELD, that this constituted a charter for one voyage, to commence at B and terminate on the return of the vessel—that *pro rata* freight was only due upon a loss proceeding from the dangers of the seas,—that the contract was an indivisible one,—and the return of the vessel to B, a condition precedent to the payment of freight.

*Appeal from Baltimore* County Court.

This was an action of covenant upon a charter party of affreightment entered into on the 27th July, 1822, between the plaintiff, now appellant, agent of the owner of the schooner *Independence,* and the defendant, the appellee, freighter of the said schooner. The said schooner was freighted by the defendant, at and from *Baltimore,* to any port or ports in the *West Indies, Spanish Main,* or ports in the *Gulph of Mexico,* at the option of the freighter, and back to *Baltimore,* where the said schooner was to be discharged, the dangers of the seas excepted. The plaintiff covenanted with the defendant, that the schooner, on and during the voyage, should be tight, staunch and strong, &c. That the defendant might load and put on board, and unload and take from the schooner, full loading, of such goods, &c. as he should think proper—contraband goods excepted. In consideration of which the defendant agreed to pay to the plaintiff in full for the freight or hire of the schooner, the sum of $200 for each and every month, and so in proportion for a less time, as the schooner should be continued on the said voyage, in ten days after her return to *Baltimore,* or upon hearing of her loss; and the said defendant did also agree, at his cost and expense, to victual and man the said schooner, and pay all port charges and pilotage during said voyage, and to deliver said schooner, on her return to *Baltimore* to the said plaintiff or his order, and also to keep her insured. It was also covenanted, that in all cases the period of time for the hire of the said vessel was to commence on the 8th of August, 1822, and end on the day of delivery of the vessel at *Baltimore* to the agent, or in the event of her total loss, upon the day on which she should

be last heard of. The declaration, after stating the charter party, the loading and sailing of the vessel from the port of *Baltimore* for the port of *Chagres*, on the *Spanish Main ;* and that from and after the 8th of August, 1822, the defendant had and employed the said schooner in his service for the space of six months, and until the said schooner was lost. That the said schooner was lost while in the service and employment of the defendant, during the voyage mentioned in the charter party, on the 28th December, 1822, at *Chagres*, on the *Spanish Main ;* of which said loss the defendant had notice on the 10th of June, 1823. Averment, that the plaintiff had kept his covenant, &c. and that the defendant had refused to pay him the sum of $1200 for the freight or hire of the said schooner, growing due from the 8th of August, 1822, until the loss of the schooner at *Chagres*, &c. As a further breach, the plaintiff averred, that on the 1st of August, 1822, the defendant took the said schooner into his service—shipped a cargo on board of her, and dispatched her from *Baltimore* towards the port of *Chagres*, on the *Spanish Main*. That the schooner afterwards arrived at the port of *Chagres*, and was there unladen by the agents and factors of the defendant. That the defendant, in pursuance of the charter party, kept and retained the said schooner in his service for a long time, to wit, from the 8th of August, in the year last aforesaid, until the 28th of December, in the same year; and afterwards the said schooner was stripped of her sails, rigging, &c. and abandoned by the crew, which the defendant had put on board for the care and navigation thereof. Averment, that the schooner was left a wreck, and was then and there totally lost, and was not further employed by the defendant. Of all which the defendant had notice before the institution of this suit. And after such notice the defendant became liable to pay to the plaintiff the sum of $1000 for the freight and hire of the said schooner from the 8th of August, 1822, until the day of her loss, viz. the 28th of December in the same year, the day on which she was last heard

of, in the prosecution of the voyage aforesaid, &c. which said sum of money the defendant had refused to pay, &c.

The defendant, after craving *oyer* of the charter party, &c. pleaded, 1st. That the said schooner *Independence* was not, at the commencement of the voyage aforesaid, and was not, during the said voyage, tight, staunch and strong, but was wholly rotten, unsound, defective and unseaworthy, whereby, and not by reason of any of the perils or dangers of the seas in the said charter party mentioned, the said vessel was prevented from arriving at the port of *Baltimore* on her return voyage, &c. He pleaded, 2dly, to the second breach in the declaration assigned, that the schooner *Independence*, after her arrival at the port of *Chagres*, and after the delivery of the cargo on the 8th December, 1822, was wholly rotten, unsound, defective and unseaworthy, and was so rotten, unsound, defective and unseaworthy from the commencement of her sailing on the said voyage, and had so continued during the whole of the voyage, whereby the said vessel was utterly disabled and incompetent further to prosecute the said voyage, and was prevented from arriving at the port of *altimore*, on her return voyage, from the causes aforesaid, and not by reason of any of the perils or dangers of the seas mentioned in the charter party, &c.

The plaintiff demurred generally to the *first* plea.

To the *second* plea he replied, that the said schooner was not wholly rotten, &c. and that she was not prevented by unsea-worthiness existing at the commencement of the voyage, from arriving at the port of *Baltimore* on her return voyage, &c.

The defendant joined in the demurrer to his *first* plea, and demurred generally to the replication of the plaintiff to the *second* plea. The plaintiff joined in the demurrer to his replication to the defendant's second plea.

The County Court overruled the demurrer to the first plea, and ruled good the demurrer to the replication to the second plea, and rendered judgment for the defendant.

From which judgment the plaintiff appealed to the Court of Appeals.

The cause was argued before BUCHANAN, Ch. J. EARLE, MARTIN, and STEPHEN, J.

*Gill*, for the appellant, contended, that in the construction of charter parties as in other contracts, the intention of the parties to be collected from the instrument, was to guide the Court. In this case, *Hamilton* let his vessel to *Warfield*, to perform a voyage to ports not specified in the contract. *Warfield* was to man and victual the vessel. He was to pay all port charges and pilotage, during the voyage. These covenants shew, that neither *Hamilton* nor his agents, were to accompany the vessel, as in ordinary cases. Taking intention as the guide, the meaning of the covenant that the vessel was to be kept sea-worthy on and during the voyage, is that *Warfield* or his agents should do it, at *Hamilton's* expense. The covenant for sea-worthiness is not a condition precedent, and if any other construction prevails than the one insisted upon, it is still no answer to a claim for freight, when the voyage has been in part performed. The defendant must redress himself by his cross action. 3 *Kent. Com.* 159. *Lawes on C. P.* 22, 23, 24, 201. *Ritchie' vs. Atkinson,* 10 *East.* 295, 311. *Havelock vs. Geddes, Ib.* 555.

The contract to pay the freight on the return of the vessel, was only to fix the time of payment, and not intended to make her return, a condition precedent to the payment. The doctrines of condition precedent are harsh and unjust. In this case they would operate inequitably. The case disclosed upon the *second* breach, shews a part performance of the voyage under a charter party, a delivery of cargo at one of the ports selected by the defendant. It shews, that at such port the vessel was stripped of her sails and rigging, and abandoned by the crew, which the defendant had put on board her, for her care and navigation; that the schooner was left a wreck, totally lost, and not further employed. To this breach the defendant pleaded that the vessel was rotten and

unsound, during the entire voyage, and was thus prevented from returning. The plaintiff replied that the vessel was sea-worthy, at her departure from *Baltimore*, and was not prevented by any defect existing at the commencement of the voyage from returning. This case stands upon demurrer. The facts admitted by the pleadings are, that the schooner left *Baltimore* in good condition; that afterwards she became unfit to prosecute her voyage, either from the circumstance that *Warfield's* crew stripped and abandoned her, and left her a wreck, or from decay arising after a commencement, and consequently, after a part performance of the voyage. Now, if the rule be sound, that unsea-worthiness arising after the commencement of the voyage, is no anwer to a claim for freight, or if, as it is contended here, it was the duty of *Warfield* at *Hamilton's* expense, to put this vessel in order at *Chagres*, and it is believed that the last proposition cannot in this case be questioned, then *Warfield* ought to pay freight up to the time of abandoning the vessel. It was his default, that his crew abandoned, and technically wrecked this vessel in a foreign port. It was his default that the necessary repairs were not attempted, and the vessel put in a condition to return. The agreement to pay freight on the return of the vessel to *Baltimore*, never was intended to affect such a state of facts as the pleadings disclosed. That agreement anticipated the voyage to be performed in the ordinary way.

It is contended also, that *pro rata* freight is due in this case, because the vessel is in fact lost to *Hamilton*, and that, by the negligence of *Warfield* and his agents. The words upon hearing of her loss, do not necessarily mean a loss by the dangers of the seas. She might be lost in many other ways, and *Hamilton* could elect either to make *Warfield* pay for the loss of the vessel or for freight—Suppose she was sunk by the guns of a foreign fort for smuggling—Suppose her burnt by an insurrection in a foreign country—or by *Warfield's* agents; can it be successfully contended that

it was the intention of these parties, upon such unexpected contingencies, that *Warfield* was not to pay for the use actually made of the vessel? Would *Hamilton* have parted with his property on such terms? We think not; and the conclusion from this is, that *Warfield* cannot escape the payment of freight for the time actually employed, by a defence which shews that in point of law, the further prosecution of the voyage was prevented, either by the direct tort of his own agents, viz: the stripping of the vessel—or by the omission to perform the duty of repairing the vessel at *Hamilton's* expense, which the contract in its spirit imposed upon him. There are strong reasons why the return of the vessel should not be considered a condition precedent to the payment of freight. It would be a rule of unequal operation in this case. It is on one hand a total loss to *Hamilton*, on the other it may be no loss, perhaps a gain to *Warfield* to discharge himself from the vessel in a foreign port. His property abroad may be unsaleable, he may have converted his property into bills of exchange. It may be that commodities proper for a return cargo cannot be had. These are circumstances which experience and the universal understanding of mankind prove to exist. It is therefore entirely doubtful whether *Warfield* was injured to the extent of the freight claimed. When the cases arise which exhibit a certain loss to one party, and which make it uncertain whether his opponent has lost or gained, that construction of the contract, which defeats the action to the prejudice of the party certainly injured, ought not to prevail. The Court presuming both to be honest men, will not hold that they intended consequences thus unequal. It is no answer to this, that the state of the fact, rather than the contract would give the rule of law. From that it is impossible always to escape; it is a mixed question, and must be so, in every case where an unexpected contingency arises. It is the duty of a Court then to survey the whole ground, and apply the honest and rational intent, according to the best under-

standing of the equities of the parties. This is not depart-
ing from the rule which says the Court must look to the con-
tract in construing it. It is merely applying the contract to the
facts which have arisen since its execution, and declares
that in such a case the contract fairly interpreted, says you
intended to pay, and in such a case it says you did not intend
to pay. In discharging this duty the equities of the parties
are not to be disregarded. And there is no rule more sub-
stantially just than that, which refers plaintiff and defendant
for breaches of covenant after part performance to their re-
spective cross actions. He cited, *Havelock vs. Geddes*, 10
*East.* 567. *Hallett vs. Col. Ins. Co.* 8 *John.* 272. *Laws on
C. P.* 162. 3 *Kent.* 157.

*Taney*, (Attorney General) for the appellee.

1. The contract in this case, was to not pay so much per
month, but was for an entire sum, for an entire voyage out,
and back to *Baltimore; Abbot on Shipping*, 360, (*Ed.* 1828)
362, 364. 10 *Petersd Abr.* 147—155.

2. The covenant to pay so much per month, for the voy-
age, on the return of the vessel, or in ten days after notice
of loss, (the dangers of the sea excepted,) means a loss
technically by the dangers of the sea, and a total loss. If
the loss results from any other cause, the freight is not
recoverable ; being an entire voyage, the freight is payable
on two contingencies; *first*, upon the return of the vessel;
or *secondly*, upon her total loss, by the perils of the sea.
These being conditions precedent, (*Abbot on Shipping*,
329, *note* (1) (*Ed.* 1828.) to entitle the plaintiff to a *pro rata*
freight, the loss must not only be total, and irreparable, but
also by the dangers of the sea, unless caused by the defend-
ant, or his agents. To show the meaning of a loss by the
perils of the sea, he referred to 5 *Petersd.* 378, 379.

The plea to the first breach laid in the declaration is,
that the vessel was unseaworthy at the commencement of
the voyage, and that thereby, the voyage was defeated;
this plea the demurrer admits to be true. In support of it

he referred to *Abbot,* 252, 253. The question upon this plea is, whether in the case of an entire voyage, a party can recover freight, who stipulates for the sea-worthiness of his vessel, when he admits that voyage to have been defeated by unseaworthiness.

In support of the defendant's demurrer to the replicacation to the second plea, he referred to, 10 *Petersd.* 146, (note) *Ib.* 151.

Martin, J. delivered the opinion of the Court.

It appears from the charter-party relied on in this case, that the schooner *Independence* was chartered by *Warfield,* to perform a voyage at and from *Baltimore,* to any port or ports, in the *West Indies, Spanish Main,* or in the *Gulph of Mexico,* and back to *Baltimore.* The intention of the parties where it can be fairly obtained from a charter-party ought to prevail in its construction, and we think it is manifest from the terms of the agreement, that this constituted but one voyage, to commence at and from *Baltimore,* and to terminate on the return of the vessel to the same place : It is agreed in express terms that the freight should be $200 a month, for the time the vessel was performing this voyage, *to be paid in ten days after her return to Baltimore.* We do not take into consideration that part of the charty-party, that allows a *pro rata* freight for the time the vessel was engaged in the voyage, *in case of a total loss,* because we think it forms no part of this case, that relates *only* to a loss, *proceeding from the dangers of the sea.* The cases referred to in the argument to shew a covenant, that a vessel forthwith be made tight, staunch, and strong, &c. is not a condition precedent, and if the freighter uses the vessel he shall be chargeable with freight *pro rata,* &c. would have great weight, where the case rested upon such a covenant *alone,* but in this charter-party the stipulations are, not only that the schooner on, and during the said voyage, should be tight, &c. but also *that the freight should be paid in ten days after the return of the*

*vessel to Baltimore.* The question then upon which this case depends, and upon which it must be decided, is, whether under this charter-party, the return of the *Independence* back to *Baltimore* is a condition precedent to the payment of freight? Upon examining the *English* authorities, many nice, and almost imperceptible distinctions, may be found upon the doctrine of freight *pro rata iteneris,* but it seems to be settled, that where freight is to be paid after the return of the vessel from her destined voyage, her return is a condition precedent, and no freight is demandable, until that condition is performed. Here is a contract between the parties, in writing, under seal, and the terms of their agreement expressed in plain and unambiguous language. It cannot, we think, be doubted, that it was the clear intention of the contracting parties, that *Warfield* should have the benefit of the whole voyage, at and from *Baltimore,* and back to the same place ; and this voyage being performed he was in ten days afterwards to pay the freight; this is an indivisible contract, the freight depending upon the performance of the whole voyage, and by the express agreement of the parties, not to be demandable until *after* the vessel should return to *Baltimore ;* if the vessel was lost by the dangers of the seas, then a *pro rata* freight was to be allowed, and paid in ten days after the loss was ascertained ; but if no injury was sustained from that cause, the whole voyage was to be performed, and then, and not till then, the charterer had a legal claim for freight. The case of *Smith vs. Wilson,* 8 *East.* 437, is an authority in point to sustain this case on the part of the appellee. That was an action to recover freight on a charter-party of affreightment, not exactly similar in all its provisions to the one now before us, but sufficiently so, to decide the question upon which this case depends. In the reported case, among other covenants not necessary to be here enumerated, it was stipulated that the ship being properly fitted, &c. should receive or take on board at *London* or *Portsmouth,* such goods as the freighter might think proper to ship, and should sail and proceed

therewith to *Monte Video*, &c.; and being arrived there, should give due notice thereof to the agents of the freighter, and make a right and true delivery, &c. and after such delivery should receive and take on board from the freighter, or his agents, &c. a full and complete cargo of lawful goods, and immediately set sail from thence, and proceed to some one port of discharge in *Great Britain*, &c. and there deliver the said cargo, &c. and there end his said intended voyage, (the act of God, the King's enemies, and the dangers of the sea excepted,) in consideration whereof the freighter covenanted that he would pay £670 *sterling* per month, for every calendar month the ship should be employed by him, during the said intended voyage to *Monte Video* and back to her port of discharge, and so in proportion for any less time, in full for the freight, or hire of said ship during her intended service; such freight to commence from the day the ship should be ready to receive the goods on board at *Portsmouth*, and end when she should have finally discharged the whole of her said cargo, &c. *such freight, &c. to be paid on the arrival of the said ship* at her destined port in *Great Britain*. The ship took on board a cargo at *Portsmouth* and commenced the voyage, but from causes stated in the report, never did arrive at her destined port in *Great Britain*. The Court decided that by the terms of the charter-party, the freight, &c. thereby covenanted to be paid, on the part of the defendant, are all of them expressly covenanted to be paid, *on the arrival and discharge of the ship at her destined port in Great Britain*; and of course, are made to depend on the event of such arrival and discharge, at her destined port in *Great Britain, as a condition precedent* to the plaintiff's right to demand the same. This doctrine is recognized by *Lord Ellenborough,* in *Ritchie vs. Atkinson,* 10 *East.* 308,—he says where, as in *Smith and Wilson,* the freight is made payable upon an indivisible condition, such as in that case, the arrival of the ship with her cargo at her destined port of discharge; such arrival, &c. must be a

condition precedent, because it is incapable of being apportioned, *Cook vs. Jennings,* 7 *Term. Rep.* 381. We are of opinion, that as the schooner *Independence* did not return back to *Baltimore*, within the terms of the charter-party, the freight claimed, never became demandable by law.

JUDGMENT AFFIRMED.